UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

UNITED STATES,                                          :
                                                        :
                                                        :
        v.                                              :        25-CR-66 (SFR)
                                                        :
ZACHARY FOSTER AND KEVIN LUCAS                          :
                                                        :
---------------------------------------------------------------- x

## MEMORANDUM AND ORDER

Defendants Zachary Foster and Kevin Lucas bring challenges relating to a Title III wiretap and an arrest and search warrant. The wiretap, authorized by the Court on February 7, 2025, included "Target Telephone 6," which the Government believed was being used by Foster. The arrest and search warrant for various individuals (including Foster and Lucas), locations, and cell phones was authorized by the Court on April 2, 2025. ECF No. 1.

Foster moves for suppression of evidence obtained from the wiretap authorization because the affidavit supporting it (the "Wiretap Affidavit") (1) failed to show necessity as required by Title III; (2) failed to establish probable cause to support a wiretap of Target Telephone 6; and (3) intentionally or recklessly omitted information material to probable cause. ECF No. 164-1, at 10-16; ECF No. 163-1, at 10-11.

Lucas joins Foster in these arguments. ECF No. 165, at 4. He also argues that the affidavit supporting the arrest and search warrant (the "Master Affidavit") failed to establish probable cause to support a search and seizure of his cell phone. *Id.* at 8-12.

For the reasons that follow, I deny Defendants' motions to suppress.

1

I.    **BACKGROUND**

On April 2, 2025, Foster and Lucas were charged by criminal complaint with: (1) possession with intent to distribute and distribution of a controlled substance and (2) conspiracy to possess with intent to distribute and distribution of a controlled substance. ECF No. 1. Foster and Lucas were arrested on April 3, 2025. ECF Nos. 7-8. On April 16, 2025, an indictment was returned charging Defendants with conspiracy to distribute and possession with intent to distribute cocaine and fentanyl. ECF No. 16.

On March 25, 2026, Foster filed a motion requesting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), relating to the Wiretap Affidavit. ECF No. 163. That same day, Foster filed a separate motion to suppress the evidence gathered through the wiretap authorization. ECF No. 164. On March 26, 2026, Lucas joined Foster's challenges relating to the wiretap authorization and also moved to suppress evidence obtained through the arrest and search warrant. ECF No. 165. The Government filed a memorandum in opposition to these motions on April 13, 2026. ECF No. 176. On April 16, 2026, I granted the motion for a *Franks* hearing in part. ECF No. 178. My order granting the hearing provided that:

> At the hearing, the defense may seek testimony from the affiant of the wiretap affidavit regarding (1) what the affiant knew about the nature of the relationship between Foster and Jamison prior to submitting the affidavit; (2) what investigation was conducted into the nature of the relationship between Foster and Jamison prior to the submission of the affidavit; and (3) what information about the nature of the relationship between Foster and Jamison was reviewed by the affiant, or available to the affiant, prior to submitting the affidavit. The hearing will not include testimony on the issue of necessity under 18 U.S.C. § 2518(3)(c).

*Id.* Thereafter, on April 20, 2026, the Government filed a motion for reconsideration of my decision to grant a hearing, ECF No. 188, which I denied on April 27, 2026. *United States v. Foster*, No. 25-CR-66 (SFR), 2026 WL 1133458 (D. Conn. Apr. 27, 2026), ECF No. 213.

2

On April 30, 2026, I held an evidentiary hearing. ECF No. 231. At the hearing, I heard testimony from one of the agents directing the investigation, Special Agent Alex MacNamara, financial investigator Special Agent Dustin Johnson, and the affiant of the Wiretap Affidavit, Special Agent James Lugo. With agreement of the parties, I admitted exhibits including the Wiretap Affidavit and related affidavits, audio recordings and linesheets from the phone call intercepts,[1] and various other documents. The Government filed a post-hearing memorandum of law on May 1, 2026. ECF No. 224. Foster did the same later that day. ECF No. 225.[2]

## II.    DISCUSSION

Foster raises several challenges to the wiretap authorization. First, he asserts that the Wiretap Affidavit failed to provide probable cause supporting the authorization, because "[n]one of the intercepted communications" upon which the affiant relied to establish probable cause "contains explicit discussion of drugs, established code words, discussion of quantities or prices, or operational details typical of drug transactions." ECF No. 164-1, at 11.

Second, Foster argues that investigators failed to properly exhaust normal investigative techniques, as required under Title III, before resorting to a wiretap. *Id.* at 14-15. He maintains

---

[1] The linesheets contain transcriptions of portions of the intercepted calls that were produced by the government. At the hearing, the agents indicated that the linesheets were available to them at the time the Wiretap Affidavit was submitted. Foster does not explicitly dispute the accuracy of the linesheets. However, as I note below, Foster does provide quotations from Session 223 in his post-hearing brief that differ slightly from language in the corresponding linesheet.

[2] Several of the exhibits referenced in this Opinion have been filed provisionally under seal. To the extent I cite to and reveal information that has been filed under seal, those cited portions of the sealed matters are simultaneously hereby unsealed as necessary and important to the court's deliberative and adjudicative process in deciding this motion. *See, e.g.*, *United States v. Small*, No. 3:25-CR-130 (KAD), 2026 WL 1078626, at *1 n.1 (D. Conn. Apr. 21, 2026); *United States v. M/Y Amadea*, No. 23 Civ. 9304 (DEH), 2025 WL 754124, at *5 n.6 (S.D.N.Y. Mar. 10, 2025) (citing *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140-42 (2d. Cir. 2004); *Eagle Star Ins. Co. v. Arrowood Indem. Co.*, No. 13 Civ. 3410, 2013 WL 5322573, at *1 (S.D.N.Y. Sept. 23, 2013)).

that the Government should have reviewed business records obtained through grand jury subpoenas for Jordan Jamison's businesses to determine whether a business relationship existed between Jamison (another individual targeted by the wiretap and suspected of trafficking narcotics) and Foster, finished a financial investigation into Foster, conducted further physical surveillance of Foster, and attempted controlled purchases from Foster using confidential sources. *Id.*

Third, Foster argues that the Wiretap Affidavit omitted information about his legitimate business dealings and landlord-tenant relationship with Jordan Jamison. *Id.* at 16. Foster asserts that the omitted information was material to the probable cause analysis because it would have provided "an innocent explanation for all intercepted communications" wherein Foster and Jamison discussed payments, meeting arrangements, and property visits. *Id.*; ECF No. 163-1, at 7-11. Foster argues that adding the omitted material into the Wiretap Affidavit would negate probable cause. ECF No. 164-1, at 16-17.

Lucas joins all of these arguments regarding the wiretap authorization. ECF No. 165, at 4. He further argues that the arrest and search warrant, which authorized a search and seizure of his cell phone, was not supported by probable cause. *Id.* at 8. Lucas argues that "the *only* so-called evidence" against him in the Master Affidavit were two phone calls, neither of which clearly discussed controlled substances, and that the basis for probable cause was therefore "mere speculation" or an "agent's unfounded and unsupported interpretation." *Id.* at 10-11 (emphasis in original).

I first address the three arguments regarding the wiretap authorization. I then assess Lucas's argument regarding the search and seizure of his cell phone.

4

A.    **Standards for Wiretap Authorizations**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Consequently, "[a]bsent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)). The same probable cause standard that applies to warrants applies to wiretap authorizations. *See United States v. Fury,* 554 F.2d 522, 530 (2d Cir. 1977); *United States v. Thomas*, No. 3:20-CR-28-2 (VAB), 2022 WL 136462, at *2 (D. Conn. Jan. 14, 2022); *United States v. Fisher*, No. 09-CR-515 (ADS)(WDW), 2011 WL 212822, at *2 (E.D.N.Y. Jan. 21, 2011) ("The standard of probable cause applicable to Title III wiretap applications is the same as the standard for a regular search warrant.") (internal quotation marks and citation omitted).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") governs wiretap applications. 18 U.S.C. §§ 2510-2522. The statute requires applications to contain "a full and complete statement of the facts and circumstances relied upon by the applicant" to establish probable cause, *id.* § 2518(1)(b), and a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," *id.* § 2518(1)(c); *see also United States v. Rajaratnam*, 719 F.3d 139, 144 (2d Cir. 2013) (citing the same). A judge may authorize the wiretap if the judge determines: (1) "there is probable cause for belief that an individual is committing, has committed, or is about to commit" an

5

enumerated offense; (2) "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception"; (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and (4) except in certain circumstances, "there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." *Id.* § 2518(3).

### B.  Probable Cause

Foster argues that the wiretap authorization was not supported by "probable cause to believe that Mr. Foster was engaged in criminal activities," ECF 164, at 1, because the Wiretap Affidavit "present[ed] no evidence that Mr. Foster engaged in drug dealing during the investigation period," such as records of sales, observed transactions, controlled purchases, or financial evidence of drug proceeds, ECF No. 164-1, at 13. He argues that "[m]ere association with a suspected criminal," Jamison, "is insufficient to establish probable cause," and that the "sparse contact pattern is inconsistent with a supplier-redistributor relationship." *Id.* The Government responds that Foster's use of coded language, his criminal history and connection to Jamison, as well as statements by a confidential source about Foster, sufficiently support the Court's finding of probable cause. ECF No. 176, at 3-6.

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Although the probable cause standard "does not demand 'hard certainties' . . . it does require more than a 'hunch.'" *United States v. Lauria*,

70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 231, and *Terry v. Ohio,* 392 U.S. 1, 22 (1968)). Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (cleaned up). This decision "must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians, act.'" *Lauria*, 70 F.4th at 128 (quoting *Gates*, 462 U.S. at 231, 238, 241).

In the context of wiretap applications, the reviewing court must determine that there is a "fair probability that contraband evidence of a crime [would] be found" in the intercepted communications. *See* 18 U.S.C. § 2518(3) (allowing wiretaps where there is probable cause to believe that "communications concerning [a] crime will be obtained through the wiretap" and "the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap"); *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999) (citing 18 U.S.C. § 2518(3)).

"[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). When a neutral and detached magistrate issues a warrant upon a finding of probable cause, a reviewing court "must accord considerable deference to the probable cause determination of the issuing magistrate." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (citation omitted). "[T]he task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded

the magistrate 'a substantial basis' for making the requisite probable cause determination." *Id.* (quoting *Gates*, 462 U.S. at 238).

### 1.    Information about Foster in the Wiretap Affidavit

On February 7, 2025, the Court (the Honorable Kari A. Dooley, United States District Judge) authorized a wiretap to include "Target Telephone 6," which listed "Zachary Lee" as the subscriber and which the Government believed was Foster's cell phone. Wiretap Aff. ¶¶ 14, 107-10, ECF No. 215-1, Ex. 3. The Wiretap Affidavit was signed and sworn to by DEA Special Agent James Lugo. *Id.* ¶¶ 47, 147.

The February 7 authorization extended a wiretap previously authorized as to phones associated with Jamison and Terrance Johnson, who were the initial focus of the investigation. Ex. 2. Before February 7, 2025, the previous wiretap had intercepted 10 conversations between Foster and Jamison, beginning on January 10, 2025. Those conversations ranged from twenty-eight seconds to five minutes and thirty-seven seconds.[3] ECF No. 215-4.

Apart from describing these previously intercepted calls between Foster and Jamison, the Wiretap Affidavit includes four pieces of information related to Foster.

First, the Wiretap Affidavit describes Foster as

a newly identified Violator. FOSTER is a 58-year-old-male, whose date of birth is known to your affiant. . . . FOSTER is believed to reside at 31 Hill Street, Waterbury, Connecticut. . . . A National Law Enforcement Telecommunications System inquiry of FOSTER revealed he is a convicted felon in the state of CT with an extensive criminal history dating back to 1996. His convictions include Criminal Possession of Firearm in 2024, Possession with Intent to Sell in 2016 and 2013. Based on court-authorized intercepted communications in this ongoing investigation, FOSTER has been identified as one of JAMISON's redistributors.

---

[3] These figures are from the linesheets. ECF No. 215-4. I note that the length of the audio files provided as exhibits is slightly shorter on average than the length indicated on the linesheets.

Wiretap Aff. ¶ 22. Second, the Wiretap Affidavit states that "in 2020, FOSTER was intercepted during a [Title III] investigation . . . and found to be involved in trafficking-controlled substances." *Id.* ¶ 78. During that investigation, he had been heard using "the code word 'girl' for cocaine." *Id.* Third, the Wiretap Affidavit describes Jamison, with whom Foster was in frequent contact, as a suspected narcotics trafficker believed to be dealing cocaine. *Id.* ¶ 43. Fourth, the Wiretap Affidavit states that in the fall of 2023, a cooperating source ("CS-1") "reported that JOHNSON, JAMISON, and FOSTER acquire their controlled substances in a similar fashion." *Id.* ¶ 37.[4]

In addition, the Wiretap Affidavit describes several calls between Foster and Jamison intercepted by law enforcement in January and early February 2025.

### a.    Session 119: The "Gir-" Call

On January 10, 2025, the Government intercepted a call between Foster and Jamison, which the parties describe as "Session 119." The Wiretap Affidavit includes part of this exchange:

> On January 10, 2025, at approximately 5:39 p.m., in session 119, JAMISON received an incoming telephone call on **Target Telephone 4** . . . . During a portion of the telephone call, FOSTER asked "You coming to Waterbury," to which JAMISON replied "Yeah". FOSTER then said "You got the gir - um, meet me at my house then when." to which JAMISON replied "Alright I'll call- I'll call you when I get in town, see where you at and I'll just pull up on you wherever." Based on training and experience, I believe when FOSTER asked "You got the gir," then stopped himself saying "girl" and changed the topic, he was referring to cocaine. "Girl" is a street term for cocaine. Whereas, heroin is

---

[4] The Wiretap Affidavit states that "CS-1 has conducted three controlled purchases from JOHNSON" and "has provided investigators with information regarding the drug trafficking activities of JOHNSON and several of his associates." Wiretap Aff. ¶¶ 34, 36. The Wiretap Affidavit states further that "CS-1 is a close associate of JOHNSON with intimate knowledge of the inner workings of the JOHNSON DTO" and "has been proven to be truthful, accurate, and reliable." *Id.* ¶ 141 n.3. The individual is cooperating "for monetary compensation" and "has been convicted of crimes including controlled substance violations." *Id.*

referred to as "boy". I also believe the abrupt topic change occurred because, in 2020, FOSTER was intercepted during a T-III investigation. During the course of the 2020 investigation, FOSTER was intercepted and found to be involved in trafficking-controlled substances, likely causing him to exercise caution to avoid further implicating himself. It should be noted that Foster used the same code word, "girl" for cocaine, when he was intercepted during a T-III investigation in 2021.

Wiretap Aff. ¶ 78.

### b.    Sessions 223 and 224: The January 12 Calls

The Wiretap Affidavit also includes two calls from January 12, 2025, during which Foster and Jamison communicated about an exchange of money, which the affiant interprets as related to the January 10 conversation about "gir-."

On January 12, 2025, at approximately 3:24 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER who was utilizing **Target Telephone 6**. During a portion of the telephone call, FOSTER said "Okay listen man ummm I got the money at my house so meet me on Baldwin Street bro," to which JAMISON replied "Aight I'll meet you over there." Based [on] training, experience and on wire communications intercepted on **Target Telephone 4,** I believe this is a continuation of session 119. This controlled substance transaction was likely made during earlier communications conducted over telecommunication methods not accessible to wire interceptions or through telephones currently unknown to law enforcement. I also believe when FOSTER said "I got the money" he indicated the transaction had been conducted with JAMISON and the payment was ready to be made to JAMSISON [sic] for the transaction.

*Id.* ¶ 108. The affiant stated in the next paragraph:

On January 12, 2024, at approximately 2:02 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER. During a portion of the telephone call, JAMISON said "Cuz I'm out here," to which FOSTER later replied "I'll be right down". Based [on] training, experience and previous wire communications on **Target Telephone 4,** I believe this is a continuation of session 224. I also believe JAMISON was alerting FOSTER he is ready to collect payment for the earlier completed controlled substance transaction. It should be noted that ping data from Target Telephone 4 placed JAMISON in the area of Baldwin Street at the time of this session. This location data confirms that JAMISON traveled to the area that FOSTER directed him to go in order to be provided with money.

*Id.* ¶ 109.

I note there appear to be four typos in this portion of the Wiretap Affidavit. First, paragraph 108 identifies Session 223 as occurring at "3:24 p.m.", whereas the linesheet places that call at 1:35 p.m. *See* ECF No. 215-4, at 6; Wiretap Aff. ¶ 108. In addition, paragraph 109 appears to mislabel Session 224 as Session 223, and as occurring in 2024 rather than 2025. *See* ECF No. 215-4, at 7; Wiretap Aff. ¶ 109. Finally, the affiant also references Session 224 as a "continuation of session 224" but presumably meant to reference the call as a "continuation of session 223." *See* ECF No. 215-4, at 7; Wiretap Aff. ¶ 109.

### c.    Session 914: The "Streets" Call

The Wiretap Affidavit also recounts a call on February 2, 2025, in which Foster and Jamison discussed several of Foster's legitimate business dealings and complained about "the streets." Wiretap Aff. ¶¶ 81, 110. The affiant wrote:

> On February 2, 2025, at approximately 11:36 a.m., during session 914, JAMISON placed an outgoing telephone call on Target Telephone 4 to FOSTER who was using Target Telephone 6. During a portion of the telephone call, FOSTER stated, "I don't want these streets no more. For real bro. I don't want…I used the motherfucker," to which JAMISON replied, "That's what I was trying to tell you when you first came home. This shit ain't worth it." JAMISON then said, "The reward ain't what it used to be. This shit ain't worth it." Based on training and experience, I believe when FOSTER said, "streets" [he] was referring to controlled substance trafficking. FOSTER's statement, "I don't want these streets no more," and JAMISON's response, "That's what I was trying to tell you when you first came home," reference FOSTER's release after a prior T-III investigation. JAMISON's comment, "The reward ain't what it used to be," indicates both are dissatisfied with the drug trade and want to leave it behind. However, the context of the conversation, including the use of the term "streets," suggests they are still actively involved in controlled substance trafficking at this time.

*Id.* ¶ 81. In a later section of the Wiretap Affidavit, the affiant mentioned this call again, writing:

As noted above, JAMISON and FOSTER spoke at length about FOSTER's desire to make money away from "the streets" in session 914. This call with JAMISON leads investigators to believe that FOSTER has reclaimed the life he was leading before he was arrested on federal narcotics charges. In the conversation, FOSTER is seemingly having a moment of introspection and is affirming what JAMISON and JOHNSON talked about in earlier sessions. However, for the time being, FOSTER is still trafficking narcotics even with his vocal displeasure of how the drug trade is currently being operated.

*Id.* ¶ 110.

### 2.    There is a Substantial Basis for the Wiretap Authorization's Probable Cause Finding

In his suppression motion, Foster argues that "[m]ere association with a suspected criminal is insufficient to establish probable cause," and the "Government presents no evidence that Mr. Foster engaged in drug dealing during the investigation period" because it presents "no sales to customers, no observed transactions, no controlled purchases, no surveillance results, and no financial evidence of drug proceeds." ECF No. 164-1, at 13. Instead, Foster argues that the Government relies "entirely on speculation about ambiguous conversations while ignoring the legitimate business context that explains them" *Id.*

I disagree. As discussed above, the wiretap application relies on background information about Foster and descriptions of four intercepted communications. The affiant identifies Jamison as an individual suspected of narcotics trafficking who had been intercepted referring to cocaine, *id.* ¶ 43, and describes Foster's contact with Jamison, *id.* ¶¶ 78, 81, 108-10. Standing alone, this information would plainly not suffice to establish probable cause to intercept Foster's calls. However, it can be considered as part of the totality of the circumstances. *United States v. Tramunti*, 513 F.2d 1087, 1101 n.19 (2d Cir. 1975) ("Quite obviously knowledge that a suspect has been a narcotics dealer or offender or has consorted with a narcotics dealer may be one important element of probable cause."). Similarly, the

12

statement from a cooperating source in the fall of 2023 that Johnson, Jamison, and Foster "acquire[d] their controlled substances in a similar fashion," Wiretap Aff. ¶ 37, and Foster's criminal record, *id.* ¶ 22, do not independently establish probable cause but do support the probable cause determination. *Gates*, 462 U.S. at 230-39 (assessing effect of informant information on probable cause under "totality of the circumstances" test); *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("Prior convictions are a relevant consideration in determining probable cause").[5]

Foster attacks the affiant's descriptions of Sessions 223, 224, and 914 as ambiguous and not supportive of probable cause. I agree that, standing alone, these calls would not likely be sufficient to provide a substantial basis for a probable cause finding. However, the affiant's description of Session 119 provides additional support for the probable cause determination. Foster attacks Session 119, arguing: "The fragment 'gir-' is entirely speculative. The Government assumes this was intended as 'girl' (cocaine) but this requires inferential leaps unsupported by context. The meeting location is Mr. Foster's rental property—exactly where a landlord would visit for legitimate purposes." ECF No. 164-1, at 11.

I agree with Foster that the affiant relies on inference.[6] However, I conclude that the Wiretap Affidavit supports the reasonable inference that Foster was using coded language to

---

[5] I note here, however, that the information from CS-1 was not current and referenced a time period from before Foster's sentencing in 2024 for a federal drug conviction. These circumstances diminish its probative weight.

[6] The Government's briefing makes the somewhat confusing argument that the Affidavit contained no inferences. In particular, the Government contends that "there is nothing inferential about the fact that Foster had previously referred to cocaine as girl the last time he had been convicted of drug dealing[, nor] is there anything inferential about the fact that he stopped himself halfway through saying 'girl' in an obvious attempt to stop himself from using a code word that had gotten him in trouble previously." ECF No. 176, at 19. But the intended meaning of Foster's intercepted communications can be determined *only* by inference. So the issue is not whether the Affidavit

refer to cocaine. The Wiretap Affidavit states that Foster had previously been convicted of narcotics trafficking and had, at that time, been heard on a wiretap using "girl" as a code word for cocaine. Wiretap Aff. ¶ 78; *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (stating that "[u]se of such a narcotics code is certainly supportive of a probable cause finding," regardless of whether "narcotics code can provide the sole basis for the issuance of a warrant") (internal quotation marks and citation omitted). A reasonable understanding of Session 119 is that Foster begins to refer to "girl" before cutting himself off and changing the subject. ECF No. 215-4, at 4; *see Fury*, 554 F.2d at 530-31 (finding probable cause where ambiguous statements could be "reasonably interpreted to indicate what the detective interpreted them to be" when considered in the context of defendant's criminal record and ongoing investigation).

Foster asserts that the meeting location referenced on January 10 was Foster's rental property, "exactly where a landlord would visit for legitimate purposes."[7] ECF No. 164-1, at 11. But Foster does not challenge the transcription of the call in the Wiretap Affidavit, provide an alternative explanation for what was said, or effectively discredit the affiant's inference.

Similarly, the Government's reading of Session 914, the "streets" call, relies on the affiant's interpretation of "the streets" as code for the drug trade. Wiretap Aff. ¶ 81. Foster argues that the reference to "the streets" could plausibly "refer to street life and crime in

---

relied on inferences—it certainly did—but rather whether the Affidavit lends reasonable support to a finding of probable cause.

[7] It is not clear that Foster is correct to say that the "meeting location is Mr. Foster's rental property," ECF No. 164-1, at 11, which I understand as a reference to the commercial property at 31 Hill Street. Instead, Mr. Foster suggests that Jamison meet him "at [his] house." ECF No. 215-4, at 4. But in any event, I don't think this argument effectively negates the Government's argument about this call.

general, not specifically to drug dealing," and that "statements about 'reward' not being 'what it used to be' could equally apply to legitimate business challenges in a difficult economic environment." ECF No. 164-1, at 12. Unlike Session 119, Foster here does provide an alternative reading of Session 914. But again, I conclude that the Government's reading of Session 914 is reasonable, and therefore it provided support for the issuing court's probable cause determination. The Wiretap Affidavit already connected Jamison with drug dealing, Wiretap Aff. ¶ 43, and relayed Foster's own relevant criminal history, *id.* ¶ 22. The affiant's interpretation of "streets" as a word relating to narcotics trafficking was reasonable. *See Cancelmo*, 64 F.3d at 808; *Fury*, 554 F.2d at 530-31. Also reasonable was the affiant's conclusion that Foster was expressing that while he would like to leave the streets behind, he had not yet done so.

Read together, the affiant's description of Sessions 119 and 914 and Foster's previous use of "girl" to refer to cocaine, combined with the other information in the warrant, provided a "substantial basis" for the issuing judge to find probable cause. *See United States v. Oztemel*, No. 3:23-CR-00026 (KAD), 2024 WL 3090251, at *7 (D. Conn. June 21, 2024) (comparing competing inferences presented by the parties and concluding that "the Government's reading of the [evidence] is at least as persuasive as Defendant's argument that it is exculpatory, particularly when read in conjunction with the other information presented in the . . . Affidavit").

Having reviewed the totality of the circumstances, I therefore decline to disturb the issuing Court's probable cause finding and deny Foster's motion to suppress on that basis. *See Gates*, 462 U.S. at 238-39.

15

### C.    Necessity for the Wiretap

Next, Foster argues that the Government failed to exhaust normal investigative techniques, as required by Title III, because investigators sought a wiretap before reviewing records obtained from grand jury subpoenas relating to Jamison's businesses, completing their financial investigation of Foster, conducting further surveillance, or attempting to make a controlled purchase from Foster. ECF No. 164-1, at 14-15. The Government responds that the Wiretap Affidavit sufficiently addressed necessity, with "approximately seventy paragraphs" dedicated to the topic. ECF No. 176, at 23. In particular, the Government argues that the Wiretap Affidavit includes a lengthy discussion of potential investigative techniques and explanations as to why these techniques would not work in this case—which was "exactly what the law requires" for wiretap applications. *Id*. I agree with the Government.

### 1.    Standard for Necessity under Title III

Pursuant to Title III, a wiretap application must provide a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c); *see also Rajaratnam*, 719 F.3d at 144. By requiring that law enforcement disclose the use, attempted use, and difficulties of employing other investigative techniques, "Congress struck a balance between the needs of law enforcement officials and the privacy rights of the individual." *United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (internal quotation marks and alteration omitted). This is true even where a wiretap would be more efficient than other investigatory techniques, reflecting "a congressional judgment that the cost of such efficiency in terms of privacy interests is too high" absent a sufficient showing of necessity. *Id.* (quoting *United States v. Lilla*, 699 F.2d 99, 105 n.7 (2d Cir. 1983)). Thus,

"telephonic surveillance may only be used when it is necessary to assist in law enforcement." *Id.*

"The statute does not require, however, 'that any particular investigative procedures must be exhausted before a wiretap may be authorized.'" *United States v. Wiley*, No. 3:21cr98 (JBA), 2022 WL 1556009, at *5 (D. Conn. May 17, 2022) (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997)) (internal quotation marks and alterations omitted). Title III does not "preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather [it] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979) (internal quotation marks omitted). "Thus, the facts set forth in the application must only be 'minimally adequate to support' the issuing judge's determination of a valid application." *Wiley*, 2022 WL 1556009, at *5 (quoting *Miller*, 116 F.3d at 663).

### 2.    Information in the Wiretap Supporting Necessity

The Wiretap Affidavit includes a section on why electronic interception was necessary to achieve the investigation's objectives, which included identifying co-conspirators of the Johnson drug trafficking organization ("DTO"),[8] locating the DTO's sources of supply and stash houses, and seizing contraband and drug proceeds. Wiretap Aff. ¶¶ 122-95. The affiant asserts that prior intercepts had not yet fully developed the scope of the Johnson DTO, the

---

[8] As noted above, the Wiretap Affidavit alleges Foster was a suspected redistributor for Jamison, another member of the DTO. Wiretap Aff. ¶ 22. The wiretap against Foster stemmed from a larger investigation into the DTO. *Id.* ¶ 6.

DTO's methods of communication beyond calls, the hierarchy of the DTO, or the DTO's supplier. *Id.* ¶¶ 124, 131-37. The affiant considers and rejects as inadequate a number of other investigative techniques, including physical surveillance, garbage seizures, pole camera footage, tracking devices, grand jury subpoenas, the use of cooperating sources, interviews, and phone records. *Id.* ¶¶ 137-94. He also notes that a financial investigation was underway, but that it was unlikely to achieve the objectives of the case. *Id.* ¶ 195.

### 3.    The Wiretap Affidavit Met the Standard for Necessity

Foster challenges the necessity showing in the Wiretap Affidavit, arguing that the affiant failed to show that investigators sufficiently pursued four specific "conventional investigative avenues," despite their availability. ECF No. 164-1, at 14.

First, he alleges that the affiant should not have sought a wiretap before reviewing Jamison's business records, including for his rental property LLCs, which would have showed an existing legitimate business relationship between Jamison and Foster and obviated the need for a wiretap. *Id.* Second, Foster argues that investigators should have completed their financial analysis of Foster before applying for a wiretap, because it could have showed whether Foster had unexplained income and because the pattern of payments between Jamison and Foster might have revealed their legitimate business relationship. *Id.* at 14-15. Third, Foster argues that investigators could have conducted additional surveillance on Foster, as they did for other targets, to establish patterns of behavior and confirm drug-dealing activity. *Id.* at 15. Finally, Foster argues that investigators should have attempted to make a controlled purchase from Foster, as they did with other targets. *Id.*

But the affiant in this case addressed each of these issues and explained the decision to apply for a wiretap. First, the affiant outlines a broad set of objectives for the wiretap,

including: the identification of all co-conspirators; identifying the sources of supply for the Johnson DTO; finding the locations of all stash houses or other DTO-related premises; seizing contraband; discovering the location of drug proceeds for seizure; and discovering other information about the financial structures of the DTO. Wiretap Aff. ¶ 122. The affiant then evaluates a variety of ongoing or potential investigative tools to achieve those objectives, including each of the tools noted by Foster, and ultimately rejects them for a variety of reasons.

As to a financial investigation and record subpoenas, the affiant notes that "[a] financial investigation is currently underway and grand jury subpoenas for a wide range of financial institutions have been issued for the records belonging to the violators and their businesses." *Id.* ¶ 195 n.4. The affiant also lists a number of business entities he believes are related to the Johnson DTO. *Id.* However, the affiant notes that "even if the financial investigation is successful," such an investigation might show unexplained wealth and uncover financial violations but is "not likely to enable case agents to accomplish the broad, stated objectives in this case" or "obtain evidence to prove beyond a reasonable doubt the existence of the large-scale narcotic conspiracy that is the target of the investigation." *Id.* ¶ 195. Moreover, the affiant noted that "the issuance of subpoenas to financial institutions is risky, because if it is learned of by the target, this would almost certainly jeopardize the investigation." *Id.*

Similarly, the affiant considers in detail and rejects the possibility of additional surveillance, including physical and pole camera surveillance targeting Foster. The affiant describes the members of the Johnson DTO as "surveillance conscious" and notes that physical surveillance in the case to date had been only "minimally effective because it was done with the benefit of consensually monitored telephone calls." *Id.* ¶¶ 141-42. Indeed, the affiant writes that "[p]hysical surveillance, standing alone, simply is not a sufficiently effective law

enforcement tool to accomplish the broad, stated goals of this investigation" and is "most successful when done in conjunction" with a Title III wiretap. *Id.* ¶ 151. The Wiretap Affidavit also specifies that close surveillance in Waterbury is particularly difficult without wiretap intercepts, because it requires "significant maneuvering" in traffic that invites detection and could jeopardize the investigation. *Id.* The affiant further notes that pole cameras and physical surveillance generally "cannot extend into a drug dealer's home, or other covert locations where drug transactions commonly take place," and even where meetings are captured by pole cameras, the video evidence rarely confirms the purpose or nature of the meeting. *Id.* ¶ 155. The Wiretap Affidavit also confirms that a pole camera placed near a location tied to Foster had, to that point, yielded no results. *Id.* ¶ 153.[9]

Finally, the Wiretap Affidavit directly addresses the feasibility of a controlled purchase from Foster. It acknowledges that cooperators had previously made controlled purchases from Johnson, but it notes that, although Foster might be willing "to sell narcotics to a carefully introduced undercover officer," the officer would be unlikely to gain information about the DTO's source of supply, and such an attempt would be "incredibly risky and too dangerous." *Id.* ¶¶ 36, 188.

In brief, each of the potential investigative techniques raised by Foster are considered and rejected by the affiant because they would fail to satisfy the broader goals of the case or create unnecessary risk. This is all that is required under the law to show necessity. *See Wiley*, 2022 WL 1556009, at *5 ("Given the affiant's clearly stated objective of 'discovering the full

---

[9] At the hearing, Special Agent MacNamara noted that a pole camera was placed to monitor Foster, but it was apparently placed at the wrong position. *See also* Wiretap Aff. ¶ 158.

scope and identification of key personnel involved in illegal drug trafficking' with Defendant, . . . and the affiant's extensive explanations why various techniques would not be productive to that end, the application was adequate" under Title III); *United States v. D'Aquila*, 719 F. Supp. 98, 104 (D. Conn. 1989) (finding necessity where "[a]ccording to the affiant, the investigation could not achieve its purpose without resort to wiretapping. That purpose. . . [was] to gather evidence on the targets of the investigation[, and] . . . uncover the full scope of what was believed to be a large-scale gambling operation" and where the affiant explained that "continued visual surveillance—in addition to posing a risk of detection—would not be effective in revealing the scope or structure of the illegal operation . . . ; search or arrest warrants would be premature and of doubtful utility . . . ; there were no witnesses or undercover agents in a position to successfully penetrate the operation . . . ; and the police lacked an informant"); *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (upholding wiretap order where the application noted that physical surveillance was impractical as it would have likely been conspicuous and drawn attention to the investigators).

I therefore find that the Government made a sufficient showing of necessity under Title III, and the motion to suppress is denied insofar as it challenges that showing.

### D.   Suppression Under *Franks v. Delaware*

Foster seeks suppression of evidence obtained through the wiretap authorization pursuant to *Franks v. Delaware* on the ground that the affiant recklessly omitted facts material to probable cause.

#### 1.   The *Franks* Standard

Although I "must accord considerable deference to the probable cause determination of the issuing magistrate" in the context of a suppression motion, *Clark*, 638 F.3d at 93, this

presumption of reasonableness can be defeated under certain circumstances, including where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *United States v. Leon*, 468 U.S. 897, 923 (1984) (citing *Franks*, 438 U.S. at 154); *accord Lauria*, 70 F.4th at 121.

The Supreme Court held in *Franks* that a court must suppress evidence where a defendant shows by a preponderance of the evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 155-56. Following *Franks*, courts have held that the same standard applies with respect to intentional or reckless omissions. *See, e.g.*, *United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000) ("To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.") (internal quotation marks omitted).

"To determine whether a false statement was necessary to a finding of probable cause, [courts] consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82 (citing *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993)). The court does not add to the affidavit any information supportive of probable cause that was omitted from the original affidavit. *See Lauria*, 70 F.4th at 125-26 (holding that, in

22

the Second Circuit, "related facts which were also known [by law enforcement officers] at the time of the [warrant] application . . . lie outside the scope of a proper *Franks* inquiry because the relevant question is whether the *remaining portions* of the affidavit give rise to probable cause.") (alterations and emphasis in original). Thus "a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause." *Id.* at 126. "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Canfield*, 12 F.3d at 718 (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). The review of probable cause of a corrected affidavit is *de novo*. *Id.* at 718 ("Once the inaccurate information has been removed from the affidavit, the remaining portions of the affidavit should be reviewed *de novo* to determine if probable cause still exists.").

The analytic framework of *Franks* applies to wiretap applications. *Rajaratnam*, 719 F.3d at 152.

### 2.    Reckless Omissions from the Wiretap Affidavit

Foster argues that the affiant was clearly "aware of Jamison's legitimate business operations" and that a reasonable investigation "would have inquired whether Zachary Foster had any documented relationship with those entities before reflexively characterizing his communications with Jamison as evidence of drug trafficking." ECF No. 163-1, at 7. He asserts that the Wiretap Affidavit excluded specific calls and portions of calls that showed this legitimate relationship, and that the affiant intentionally or recklessly excluded this information that would have recontextualized Foster and Jamison's exchanges about money as an innocent landlord-tenant relationship unrelated to drug trafficking. *Id.* at 8-9; ECF No.

23

164-1, at 16. In his post-hearing brief, Foster emphasizes that the agents consistently "omitted material portions of two intercepted calls [included in the affidavit] and deliberately omitted several other entire calls that did not fit their narrative from the affidavit," which "misled the reviewing District Court." ECF No. 225, at 2. He argues that the testimony at the hearing revealed that "the agents repeatedly ignored or looked the other way when faced with any fact that did not fit their narrative." *Id.* at 4. Whereas "any inference that remotely could mean drug dealing was credited as being crystal clear certain proof," in contrast "any inference that had any other meaning was discredited, unclear, or unknown." *Id.*

In its initial briefing, the Government argues that "there was no omission"—that the affiant "included what [he] knew about Jamison's business operations in the affidavit"; that "the Government had not received any of the business records" it had requested at the "time the affidavit was signed"; and that "even after receiving the business records and financial documents, there was no mention of Foster being a tenant of Jamison's or Jamison's business entities." ECF No. 176, at 29. In its post-hearing brief, the Government concedes that the affiant omitted certain calls and sections of calls reflecting "the fact that there was some sort of shared business partnership between" Foster and Jamison but argues that the affiant and other investigators lacked the requisite subjective state of mind for the court to find recklessness. ECF No. 224, at 3-4. In the Government's view, the affiant simply was not aware of the landlord-tenant relationship and, to the extent that investigators were aware that Foster and Jamison had some kind of legitimate business relationship, they believed it was not relevant and made a reasonable choice to exclude that information from the Wiretap Affidavit. *Id.* at 2, 4-7.

24

### a.    Standard for Reckless Omissions Under *Franks*

As the Second Circuit has observed, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted). Rather, "*Franks* protects against omissions that are *designed to mislead,* or that are made in *reckless disregard of whether they would mislead,* the magistrate." *Id.* (emphasis in original) (quoting *United States v. Awadallah*, 349 F.3d 42, 67-68 (2d Cir. 2003)); *see also* Wayne R. LaFave, 2 *Search & Seizure* § 4.4(b) (6th ed.).

The Supreme Court in *Franks* did not define the term "reckless disregard." However, in *Rajaratnam*, the Second Circuit held that a subjective test governs the recklessness inquiry. *See Rajaratnam*, 719 F.3d at 153 ("This inquiry, which looks to the mental states of mind of government officials, is said to be a 'subjective' test rather than an 'objective' one.") (citing *Farmer v. Brennan*, 511 U.S. 825, 838-40 (1994)).[10] The Second Circuit observed that "[w]hether an individual had a particular mental state 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,' but courts

---

[10] In *Farmer*, the Supreme Court adopted a subjective standard for Eighth Amendment conditions of confinement cases, concluding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it.").

Some circuits appear to apply an objective recklessness standard to *Franks* motions. *See, e.g.*, *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (stating that "omissions are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known . . . was the kind of thing the judge would wish to know'"); *United States v. Alford*, 764 F. Supp. 3d 191, 246 (M.D. Pa. 2025) (discussing different approaches of circuits).

must not 'confus[e] a mental state with the proof of its existence.'" *Id.* (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted).

With respect to omissions, *Rajaratnam* acknowledged that "the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information in a wiretap application." *Id.* at 154. However, "such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information, and the inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the wiretap application." *Id.* at 154-55 (citations omitted). Rather, before a court may find recklessness, the court "must be presented with credible and probative evidence that the omission of information in a wiretap application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154. Recklessness must be demonstrated by a preponderance of the evidence. *Franks*, 438 U.S. at 155-56; *United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y. 2013).

My analysis as to reckless omission focuses on Special Agent James Lugo, the affiant who signed the Wiretap Affidavit. Although Agent Lugo did not, by his own admission, draft or edit the affidavit, "[t]he requirement in the law of the oath of a responsible public officer to the showing of the probable cause was to make *the affiant* legally responsible for any statements of fact relied upon by the Judge who issues the warrant." *United States v. Tortorello*, 342 F. Supp. 1029, 1035 (S.D.N.Y. 1972) (emphasis added); *see also United States v. McKenzie*, 13 F.4th 223, 236 (2d Cir. 2021) (stating, in the context of a *Franks* violation, that "[t]he Supreme Court has interpreted the warrant clause as containing an implicit

26

guarantee that the information in a warrant application is 'truthful' in the sense that the information put forth is believed or appropriately accepted by *the affiant* as true") (internal quotation marks and citation omitted) (emphasis added). Although other agents apparently directed the investigation, decided which information to include and exclude from the Wiretap Affidavit, and wrote the text of the Wiretap Affidavit, when Agent Lugo signed the affidavit he "became responsible for the contents of the application and the consequences thereof." *Freedman v. Am. Online, Inc.*, 303 F. Supp. 2d 121, 123 n.5 (D. Conn. 2004) (citing *Tortorello*, 342 F. Supp. at 1035). Thus, I consider Agent Lugo's state of mind for the purpose of evaluating whether the omission of information from the Wiretap Affidavit was reckless.[11]

### b.    Omissions Related to Property Management

Prior to the submission of the Wiretap Affidavit on February 7, 2025, agents intercepted a total of 10 calls between Foster and Jamison. Together, the length of the calls totals approximately 17.5 minutes. The affiant acknowledged at the hearing that he listened to the calls in their entirety prior to swearing to the Wiretap Affidavit. As discussed above, the Affidavit describes four calls: a call on January 10 (the "gir-" call), two calls on January 12 about meeting up, and a call on February 1 (the "streets" call).

The affiant did not describe all calls between Foster and Jamison in the Wiretap Affidavit. Some of these omitted calls were plainly and unambiguously related to property issues. *See* ECF No. 164-1, at 5-6. For example, Sessions 783, 788, 789 contained a back-and-

---

[11] Agent Lugo acknowledged at the hearing that he had the ability to make additions or other edits to the Wiretap Affidavit. He also explained he was immersed in the investigation and listened to all the calls before swearing to the Affidavit.

27

forth about a power outage. ECF No. 215-4, at 9-11; Exs. 23A, 24A, 25A.[12] In Session 783, Foster called Jamison to let him know the power was out at "the Spot," and, after discussing the issue, Jamison instructed Foster to call him back when "he got over there" to evaluate what had happened. ECF No. 215-4, at 9; Ex. 23A. In Session 788, Foster told Jamison that he would call Eversource to discuss the issue, and Jamison told Foster that "if it's something with the building" he would "send someone over there," and again instructed Foster to call him back when he figured it out, *id.* at 10; Ex. 24A, which Foster did in Session 789 once the power was restored, *id.* at 11; Ex. 25A. These exchanges plainly suggested interest in a shared property and were entirely omitted from the Affidavit.

Session 906 also clearly included a discussion about shared property management. On February 1, 2025, Foster and Jamison had the following exchange.

FOSTER: Yo.

JAMISON: What's going on.

FOSTER: I see that bill, so what they- what they trying to say?

JAMISON: I don't know, that just came in the mail, that's why I sent it to you.

FOSTER: I mean, I know, we done I done been in business with you for like six months?

JAMISON: You say, you been in business for six months?

FOSTER: I been in business with you for like six months, right?

JAMISON: Probably a little longer than that.

FOSTER: Alright, alright, well say May. Right? May, June?

---

[12] Where applicable, I will refer to the linesheets or audio files of the relevant calls both where they appear on the docket and by the exhibit numbering system used by the parties at the *Franks* hearing.

JAMISON: Uh huh.

FOSTER: So well you know you know damn well I ain't accumulate no 900-dollar motherfucking water bills. So what we gonna do? I don't have a problem . . . taking, taking care of that shit.

JAMISON: Well that's what I'm saying, that's I thought you- that's why I told you to been switch it because- [voices overlap]

FOSTER: I thought I did, I thought I switched off the bills, bro, it don't, it don't matter, because whatever we gotta do to make it right, bro, whatever I gotta do to make it right, I'ma- I'ma do.

JAMISON: [incomprehensible] We go down there and [voices overlap] then take care of it.

FOSTER: When?

JAMISON: Probably like the beginning of the week. [voices overlap] Or the middle of the week.

FOSTER: You listening to me? I said you listening to me?

JAMISON: Yeah.

FOSTER: We ain't gonna never have no beef over no motherfucking money.

JAMISON: Nah, nah.

FOSTER: I'm just letting you know that.

JAMISON: Nah, I ain't call for that. I just sent it just in case, you know what I mean? [voices overlap]

FOSTER: No, no, I'm just saying, just letting you know, we gonna figure out whatever it is, and we gonna take care of it.

JAMISON: Alright.

FOSTER: Alright? Yo.

JAMISON: Alright, bet.

FOSTER: Now get the fuck off my phone.

The two exchange joking goodbyes.

29

*Id.* at 13; Ex. 27A.[13] This call was omitted from the Wiretap Affidavit.

### c.    Omissions Relating to Meet Up Calls

Several other calls contained discussions about Foster and Jamison meeting up. Although these calls were described in the Wiretap Affidavit, relevant portions were omitted.

The call on January 10, 2025, which the affiant interprets as relating to drugs, was included in the Wiretap Affidavit but was edited to remove pleasantries at the beginning and end of the call. *See* Wiretap Aff. ¶ 78. In the transcription of Session 119 below, only the bolded text was included by the affiant:

FOSTER: Yo!

JAMISON: Yo . . .

FOSTER: Yo!

JAMISON: How you doing cuzzy?

FOSTER: Hello?

JAMISON: Yo you can hear me?

FOSTER: Yeah, what's up?

JAMISON: Ain't nothin'. What's going on with you?

FOSTER: Nothing, where you at?

JAMISON: Uh,.. I'm about to be coming back from Bristol.

**FOSTER: You coming to Waterbury?**

**JAMISON: Yeah.**

**FOSTER: You got the gir- [ph] um, meet me at my- at my house then when.**

---

[13] The transcription for this call was not provided by either party. The court manually transcribed it from the audio provided.

**JAMISON: Alright I'll call- I'll call you when I get in town, see where you at and I'll just pull up on you wherever.**

FOSTER: Yup, yup.

JAMISON: Alright, bet.

ECF No. 215-4, at 4; Ex. 12. As noted above, the affiant interpreted the reference to

"the gir-" as referring to cocaine. Wiretap Aff. ¶ 78.

Two calls on January 12, Sessions 223 and 224, were partially included in the Wiretap

Affidavit. Wiretap Aff. ¶¶ 108-09; Exs. 20, 21. On January 12, 2025, the two men had the

following conversation. The following is the linesheet from the entire call, with the bolded text

showing what the affiant included in the Wiretap Affidavit:

JAMISON: Yo what up Easy-E

FOSTER: What the fuck do you want Nigga?

JAMISON: Where the fuck you at nigga?

FOSTER: Ducking Yo ass, I duck the rent man that's what I do *laughs*

JAMISON: *Laughs* Ion no Ion know you to be no ducker

FOSTER: I'm just saying What's up my nigga where you at?

JAMISON: Uhh I'm right here by Wolcott Street where you at?

**FOSTER: Okay listen man ummm I got the money at my house so meet me on Baldwin Street bro**

**JAMISON: Aight I'll meet you over there.[14]**

FOSTER: Alright bet.

---

[14] This sentence was followed in the linesheet by this notation, which was not included in the affidavit: [The keypad of a safe can be heard in the background with the chime of a seatbelt sign].

ECF No. 215-4, at 6; Ex. 20. In his post-hearing brief, Foster describes lines four and five as follows. Foster: "I don't know ducking yo ass. I ducked the rent, man." ECF No. 225, at 8. Jamison: "I don't know, I don't know you to be no ducker." *Id.*

Shortly after, the two had another conversation. The linesheet from that call reads:

FOSTER: Yooo

**JAMISON: Cuz I'm out here**

FOSTER: What the fuck is you calling my phone for nigga you don't- you don't want your money?

JAMISON: Drag your ass nigga I'm out here[15]

**FOSTER:** You-you don't want *laughs* **I'll be right down**

JAMISON: Alright

ECF No. 215-4, at 7; Ex. 21.

Regarding these two calls, the Wiretap Affidavit states:

108. On January 12, 2025, at approximately 3:24 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER who was utilizing **Target Telephone 6**. During a portion of the telephone call, FOSTER said "Okay listen man ummm I got the money at my house so meet me on Baldwin Street bro," to which JAMISON replied "Aight I'll meet you over there." Based [on] training, experience and on wire communications intercepted on **Target Telephone 4**, I believe this is a continuation of session 119. This controlled substance transaction was likely made during earlier communications conducted over telecommunication methods not accessible to wire interceptions or through telephones currently unknown to law enforcement. I also believe when FOSTER said "I got the money" he indicated the transaction had been conducted with JAMISON and the payment was ready to be made to JAMSISON [sic] for the transaction.

109. On January 12, 2024, at approximately 2:02 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER. During a portion of the telephone call, JAMISON said "Cuz I'm out

---

[15] This sentence was followed in the linesheet by this notation, which was noted in the affidavit: [Ping data shows JAMISON in the area of Baldwin Street].

32

here," to which FOSTER later replied "I'll be right down". Based [on] training, experience and previous wire communications on **Target Telephone 4**, I believe this is a continuation of session 224. I also believe JAMISON was alerting FOSTER he is ready to collect payment for the earlier completed controlled substance transaction. It should be noted that ping data from Target Telephone 4 placed JAMISON in the area of Baldwin Street at the time of this session. This location data confirms that JAMISON traveled to the area that FOSTER directed him to go in order to be provided with money.

Wiretap Aff. ¶¶ 108-09.

### d.    Omissions Relating to "Streets" Call

Finally, with respect to the "streets" call between Foster and Jamison on February 1, 2025, the affiant included only the following bolded text but omitted the discussion of Foster's legitimate business ventures. The linesheet of the call reads:

JAMISON asks if FOSTER did not get Uber Grub. FOSTER replies he will use his son's grandmother to cook soul food.

FOSTER and JAMISON talk about a soul food place opening up

FOSTER says that he is spreading himself too thin

FOSTER: Cuz, listen man, I'm I'm I'm doin I'm doin the sober house right now too my nigga. I've been doin a lot of shit. Know what I mean? I got my little truck and shit going. I got all this shit going. And, you know… been spending a lot of money trying to get everything together and I'm just spreading myself a little too thin. But you damn right. [voices overlap]

JAMISON: Now that U/I, now if that U/I…

FOSTER: You damn right, so I'm on it man.

JAMISON: That shit gonna help. That's gonna get more, a little bit more traction. [voices overlap]

FOSTER: That's gonna move… that's gonna take me to another level.

JAMISON: Yea.

FOSTER: You damn right. Everybody told me the same thing. You ain't said nothing wrong. [studders] Just understand that. Uhh, I'm I'm I'm the type of nigga, like, um I ain't hard headed motherfucker. You tell me something, and

that shit, it is what it is. I'm willing to do that shit cus I wanna make this shit successful man. I mean for real.

JAMISON: Nah, fact.

FOSTER: I don't, I don't, I don't, **I don't want these streets no more. For real bro. I don't want…I used the motherfucker** [voices overlap]

JAMISON: Nah, it ain't, I tell, **that's what I was trying to tell you when you first came [home]. This shit ain't worth it** man.

FOSTER: Yea, yea…

JAMISON: The the **the reward ain't ain't what it used to be. This shit ain't even worth it no more.** [voices overlap]

FOSTER: No doubt. No doubt. Yea, know what I mean?

JAMISON: This shit ain't worth it at all. That's why I always be like… when I'm straight on that shit, like that should be…

Conversation then turns to FOSTER having seen "little Rob" the day prior.

FOSTER says that he saw little rob "bowens" at a funeral

JAMISON and FOSTER discuss BOWENS being hard to read

FOSTER will answer his girl call

ECF No. 215-4, at 15-16; Ex. 28.[16]

### 3.    Evaluating Whether Affiant Acted Recklessly

As an initial matter I note that, as the Government concedes, the affiant certainly omitted information relating to the business relationship between Foster and Jamison. The Wiretap Affidavit references four calls. Of the included calls, the affiant omitted substantial portions of each call. The affiant also had, but did not include, six additional calls, five of

---

[16] Foster also provided two additional exhibits: what appears to be a lease signed by Foster and Jamison for 31 Hill Street, and a purported set of cash receipts for rent payments from Foster to Jamison. *See* ECF Nos. 214-3, 214-4; Exs. DX1, DX2. It is uncontested that these exhibits were not known to investigators before February 7, 2025. I therefore do not consider them "omitted" for the purpose of this motion.

which obviously involved property maintenance, including electrical, plumbing, and water utility issues. The relevant question, then, is whether the omissions were designed to mislead or were made in reckless disregard of whether they would mislead.

Citing *Rajaratnam*, the Government argues that for Foster to demonstrate recklessness, Foster "must demonstrate that the relevant investigators 'in fact entertained serious doubts as to the truth of [their] allegations.'" ECF No. 224, at 4 (quoting *Rajaratnam*, 719 F.3d at 154). In that fragment of *Rajaratnam*, the Second Circuit quoted from *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001), which analyzed a false statement in an affidavit. The *Rajaratnam* court proceeded to quote *Whitley*'s observation that "[b]ecause states of mind must be proved circumstantially, a factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Rajaratnam*, 719 F.3d at 154 (quoting *Whitley*, 249 F.3d at 621).

However, the language quoted by the Government refers to reckless *false statements*, rather than reckless *omissions*. "The guideposts for determining recklessness are different when evaluating misrepresentations and omissions." *Lahey*, 967 F. Supp. 2d at 709 (internal quotation marks and citation omitted). With respect to false statements, courts generally ask "whether the affiant made a false statement with knowledge that the statement was false; had a serious doubt as to the truth of the statement when [he or she] made it; or had obvious reason to doubt the veracity of the statement." *Id.* at 709-10 (internal quotation marks and citations omitted).

However, with respect to an *omission*, it does not make sense to ask whether an affiant had serious doubts about the truth of a statement—as the court is examining an omission by the affiant, not an affirmative statement. As *Rajaratnam* explains, the relevant inquiry with

respect to omissions is whether "the omission of information in a wiretap application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Rajaratnam*, 719 F.3d at 154 (quoting *Awadallah*, 349 F.3d at 68).[17] *Rajaratnam* acknowledges that "the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information in an wiretap application" but "a wiretap applicant does not *necessarily* act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *Id.* Rather, "the reviewing court must be presented with credible and probative evidence that the omission of information in a wiretap application was "designed to mislead" or was "made in reckless disregard of whether [it] would mislead."

It is unclear precisely what the Government means when it asserts that Foster "must demonstrate that the relevant investigators 'in fact entertained serious doubts as to the truth of [their] allegations.'" ECF No. 224, at 4 (quoting *Rajaratnam*, 719 F.3d at 154). Foster is not claiming that the Wiretap Affidavit includes a false statement.[18] Foster's claim is that the affiant omitted information that detracted from probable cause.

To the extent the Government contends that a reckless omission cannot be found so long as an affiant "believes" a person is guilty of a crime, *Rajaratnam* establishes no such standard. The role of the affiant is to present the relevant facts to the judge reviewing the

---

[17] It appears that the *Rajaratnam* Court quoted *Whitley* as an example of a court applying a subjective recklessness standard.

[18] In the Wiretap Affidavit, Agent Lugo avers that he is "one of the agents directing an investigation into suspected drug trafficking" by the Johnson DTO. ECF No. 215-1, ¶ 6. Foster's counsel questioned Agent Lugo about whether this statement was false. Although I find that Agent Lugo was not one of the two agents directing the investigation, I do not believe that this statement was material to the Court's probable cause finding.

application so that *the judge* can determine if those facts establish probable cause. An affiant cannot simply omit facts from the affidavit that plainly detract from probable cause and then insulate that decision by declaring that they have a "good faith belief" that the target of the investigation has committed criminal activity. Such a rule removes the judge from the equation and is contrary to *Franks*. *See Washington v. Napolitano*, 29 F.4th 93, 108 (2d Cir. 2022) ("[A] police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.") (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)).

Accordingly, I will follow the standard as laid out by the Second Circuit in *Rajaratnam* and determine whether the affiant omitted information "in reckless disregard of whether [it] would mislead" the Court. *Rajaratnam*, 719 F.3d at 154.

### a.    The Omissions with Respect to January 12 Calls Were Misleading

As an initial matter, I conclude that the Wiretap Affidavit's description of the January 12 calls between Foster and Jamison (Sessions 223 and 224) was misleading given the affiant omitted the exchange referencing rent from Session 223 and also omitted information (known to him through other calls) about the business relationship between the men and their shared interest in a property.

In Session 223, a call that lasted less than a minute, Jamison calls Foster and asks him where he is. Foster replies and says, with a laugh, "Ducking Yo ass, I duck the rent man that's what I do."[19] ECF No. 215-4, at 6; Ex. 20. Jamison responds that he knows Foster isn't a

---

[19] I quote here from the linesheet. ECF No. 215-4, at 6; Ex. 20. As noted, Foster's post-hearing brief transcribes this excerpt as "I ducked the rent, man." ECF No. 225, at 8. At the hearing, the lawyers and witnesses referred to this phrase as "I duck the rent man" or "ducking the rent man."

"ducker." *Id.* Foster replies by telling Jamison he has the money at his house and says Jamison can meet him at Baldwin Street. *Id.* No other topics are discussed in the call. In Session 224, an even shorter call, Jamison tells Foster "I'm out here" to which Foster responds, "I'll be right down." ECF No. 215-4, at 7; Ex. 21. No other topics are discussed in the call.

The Wiretap Affidavit provides the wrong time for Session 223, stating it occurred at 3:24 p.m., which would be more than an hour after Session 224, which occurred at 2:02 p.m. Session 223 actually occurred at 1:35 p.m. Moreover, the Wiretap Affidavit provides the wrong date for Session 224 ("January 12, 2024"), incorrectly labels Session 224 as "Session 223," and describes Session 224 as a "continuation of session 224" but presumably meant to reference the call as a "continuation of session 223."

More concerning than these typographical errors, however, is that the Wiretap Affidavit entirely omits the exchange on Session 223 about "duck[ing] the rent man." As the affiant admitted at the *Franks* hearing, he was not aware of prior investigations where "ducking the rent man" had been used as a coded drug term, nor did he think he had heard that term in a drug dealing context previously. He further acknowledged that a "person on the street" would think that "ducking the rent" is "about rent." In other words, a reasonable understanding of the January 12 calls is that Foster owed Jamison rent, Foster had the money for Jamison at his house, Foster said he would give Jamison the money if Jamison came to Baldwin Street, and Jamison then proceeded to pick up the money.

---

For purposes of the *Franks* analysis, I do not think it makes a difference whether the reference is to ducking the "rent" or the "rent man."

However, instead of providing information that would allow the Court to consider this reasonable interpretation of the call, the Wiretap Affidavit presents Session 223 as evidence of Foster paying Jamison for drugs and entirely omits the reference to rent. Paragraph 108 states in full:

> On January 12, 2025, at approximately 3:24 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER who was utilizing **Target Telephone 6**. During a portion of the telephone call, FOSTER said "Okay listen man ummm I got the money at my house so meet me on Baldwin Street bro," to which JAMISON replied "Aight I'll meet you over there." Based [on] training, experience and on wire communications intercepted on **Target Telephone 4**, I believe this is a continuation of session 119. This controlled substance transaction was likely made during earlier communications conducted over telecommunication methods not accessible to wire interceptions or through telephones currently unknown to law enforcement. I also believe when FOSTER said "I got the money" he indicated the transaction had been conducted with JAMISON and the payment was ready to be made to JAMSISON [sic] for the transaction.

Wiretap Aff. ¶ 108. Paragraph 109 continues along these lines, stating:

> On January 12, 2024, at approximately 2:02 p.m., in session 223, JAMISON placed an outgoing telephone call on **Target Telephone 4** to FOSTER. During a portion of the telephone call, JAMISON said "Cuz I'm out here," to which FOSTER later replied "I'll be right down". Based [on] training, experience and previous wire communications on **Target Telephone 4,** I believe this is a continuation of session 224. I also believe JAMISON was alerting FOSTER he is ready to collect payment for the earlier completed controlled substance transaction. It should be noted that ping data from Target Telephone 4 placed JAMISON in the area of Baldwin Street at the time of this session. This location data confirms that JAMISON traveled to the area that FOSTER directed him to go in order to be provided with money.

*Id.* ¶ 109.

Paragraph 108 is undeniably a misleading presentation of Session 223. The affiant encourages the Court reviewing the wiretap application to draw the inference that the meeting on January 12 is for payment for drugs that "he believes" Foster received from Jamison

previously. But the affiant omits from the description of the 43-second call[20] the information *contained in the call itself* that is relevant to evaluating the purpose of the exchange of money. This was not a lengthy call covering multiple topics. This was a quick call containing information that would have aided the Court in assessing the probable reason that Foster was giving money to Jamison. Yet the affiant omitted that information. He also omitted from the Wiretap Affidavit his knowledge that Foster and Jamison had spoken multiple times about issues relating to a property, including exchanges about how to get the electricity back on at the property, ECF No. 215-4, at 9-11; Exs. 23A, 24A, 25A, and who was responsible for paying a $900 water bill. ECF No. 215-4, at 13; Ex. 27. Knowing that the men had some kind of business relationship and a shared interest in a property would have made it more likely that the Court would have viewed the January 12 calls as about rent rather than payment for drugs. The omitted information plainly undermines probable cause.

Providing an incomplete account of the January 12 calls was also misleading in that the description was used to bolster the Wiretap Affidavit's interpretation of Session 119's reference to "gir-" as a request for drugs. The rent reference and information about the shared property interest shows Jamison and Foster had reasons to interact that did not involve drugs and makes it less likely that Session 223 reflects payment for an exchange of drugs initiated by Session 119. Although the omitted information does not explain away the "gir-" call entirely, it undermines its force to at least some degree.

---

[20] As noted above, the linesheet says the call was 43 seconds whereas the audio file provided shows the call as 32 seconds.

Thus, I conclude that omitting from the Warrant Affidavit the exchange referencing the "rent" or "rent man" in Session 223 and information indicating that Jamison and Foster had a shared interest in a property was misleading. Next, I consider whether the affiant's omissions were made with a reckless disregard of whether they would mislead, bearing in mind that a subjective recklessness standard applies.

### b.    Affiant Acted with Reckless Disregard as to Whether Omissions Would Mislead

As I will explain, I find based on the nature of the omissions and the affiant's testimony at the *Franks* hearing that the affiant acted with reckless disregard as to whether the omissions would mislead. I draw this inference with respect to the affiant omitting from his description of Session 223 in the Wiretap Affidavit the exchange referencing "rent" or the "rent man," the fact that this exchange occurred immediately before Foster said he had the money at his house, and the fact that the call was short and covered no other topics. I also draw the reckless disregard inference with respect to the affiant omitting from the Wiretap Affidavit the fact that intercepted calls showed that there was some form of business relationship between Foster and Jamison that involved a shared interest in a property and that the men spoke multiple times about topics relating to the property and other businesses.

My finding does not extend to every detail of the calls between Foster and Jamison relating to electricity, plumbing, the water bill, restaurants, social clubs, sober houses, or other business activities. However, I do find that the Wiretap Affidavit's failure to at least reference the overarching business relationship between Foster and Jamison, their shared interest in a property, or their relatively frequent conversations on these topics reflects an omission made with reckless disregard for whether it would mislead the Court.

41

### i.      Affiant's Knowledge

First, there is no question that the affiant was aware of the content of all 10 calls between Foster and Jamison when he swore to the truth of the Wiretap Affidavit. The affiant confirmed at the hearing that he had listened to the calls in their entirety. In addition, the affiant was aware that the references to rent and discussions about property maintenance were omitted from the Wiretap Affidavit. This is not a case of a mistaken or inadvertent omission.

### ii.      Significance of the Omissions

As explained above, the omitted information is central to any proper understanding of the January 12 calls. Those brief calls contained no explicit discussion of drug activity. Foster and Jamison did not discuss prices or quantities on the calls or use known code words for drugs. In the Wiretap Affidavit, the affiant asks the Court to draw an inference that the calls were to arrange payment for a drug transaction that had already occurred. Wiretap Aff. ¶ 108. Yet the affiant was aware agents had not actually observed any such transaction. The Wiretap Affidavit acknowledges as much. Indeed, at the hearing, the affiant testified that he did not know for certain that Foster had actually obtained drugs from Jamison. Under these circumstances, where it isn't even clear a previous exchange of drugs had occurred, information that might bear on the purpose of the payment discussed in the calls is particularly relevant.

Rather than disclose Foster's lighthearted comment that he was "duck[ing] the rent man," which occurred only seconds before the men arranged to meet up for Foster to give Jamison money, the affiant provided an interpretation of the call anchored on the "gir-" call from two days before. Moreover, despite the multiple calls between the men relating to maintenance of a property, the affiant did not inform the Court that the men had this shared

interest in a property and thus had a reason other than drug dealing to interact and exchange money. I conclude that the particular circumstances surrounding these omissions strongly support drawing an inference that the affiant acted in reckless disregard to whether the description of the January 12 calls would mislead the Court.

### iii.    Impact of Omissions on Probable Cause

In considering subjective recklessness, I also consider the fact that the omitted information was "clearly critical" to the probable cause assessment and would have weakened rather than strengthened probable cause.

*Rajaratnam* recognizes that "[o]f course, the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be inferred from the omission of critical information in a wiretap application," but cautions that "such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information." 719 F.3d at 154. Thus, the significance of the affiant's omissions to the probable cause assessment is probative, but not dispositive, evidence of whether the affiant acted with reckless disregard for whether the omissions would mislead. I also consider whether the omitted information would have strengthened or weakened the case for probable cause. *See Rajaratnam*, 719 F.3d at 155 n.18 (stating that "whether an omission would have strengthened or weakened the wiretap application is . . . probative of whether the omission occurred with 'reckless disregard for the truth' as "it is difficult to imagine a situation where the government would intentionally or 'with reckless disregard' omit information that would strengthen its 'probable cause' or 'necessity' showing").

As discussed above, the exchange referencing rent in the Wiretap Affidavit's description of session 223—as well as other evidence that Foster and Jamison had a legitimate

business relationship and a shared interest in a property—would have certainly weakened probable cause.

Moreover, the omitted information is particularly relevant to the overall probable cause assessment because the Wiretap Affidavit does not include extensive evidence regarding Foster. It contains no observations from surveillance of Foster engaging in suspicious activities or instances of controlled buys from Foster. Instead, the Wiretap Affidavit points to Foster's prior criminal history, vague information a cooperating source provided in 2023 about Foster, and descriptions of four conversations Foster had with Jamison. None of those four calls explicitly discussed drug transactions. The Government cites only one call, the "gir-" call, as an example of Foster and Jamison using coded language to refer to drugs.

Sessions 783, 788, and 789, during which Foster and Jamison discussed a power outage at a shared property, were clearly related to a property management issue, suggesting both that Foster and Jamison had a shared business relationship and that they discussed that relationship on the phone. Session 906 was, unambiguously, a dispute over a utility bill at a shared property. Session 814 included extensive discussion of legitimate businesses run by Foster. As discussed above, including information about this legitimate relationship (along with the "I duck the rent man" reference) would have undermined the Wiretap Affidavit's suggestion that the January 12 calls related to a payment for drugs. This in turn would have reduced the significance of the "gir-" call, at least to some degree. The information about Foster's legitimate business activities would have also been relevant in assessing the meaning of Session 914, the "streets" call. The affiant excluded from the Wiretap Affidavit the majority of Session 914, which includes a substantial discussion of legitimate businesses run by Foster. Instead, the affiant

44

included only the discussion of "these streets," which the affiant said he believed related to the drug trade.

Notably, the affiant pointed to no coded language relating to drugs—including discussion of quantities, costs, or drug type—in any of the 10 calls the agents possessed between Jamison and Foster, except for the partial reference to "gir-" in a single call.

Thus, the omitted information would have played a critical role in the probable cause assessment, and inclusion of the omitted information would have weakened probable cause. "[I]n this regard, this case is distinguishable from *Rajaratnam,* where 'it [was] clear that fully disclosing [the omitted information] would have only *strengthened* the . . . application.'" *Lahey*, 967 F. Supp. 2d at 723 (quoting *Rajaratnam*, 719 F.3d at 155) (emphasis in original); *cf. Rajaratnam*, 719 F.3d at 155 (stating that the district court's inference of recklessness was particularly inappropriate, "where the information omitted would only have further supported the government's position").

#### iv.    Affiant's Explanation for Omissions

*Rajaratnam* instructs that an inference of subjective recklessness is "particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the wiretap application." *Rajaratnam*, 719 F.3d at 154-55.

There is no claim here that the omission was the result of negligence. Instead, the Government urges that the affiant made a "considered and reasonable judgment that the information was not necessary to the wiretap application." ECF No. 224, at 6. The Government argues that it was reasonable not to include in the Affidavit information "about the joint

business venture, whatever it was" because, *inter alia*, it "was reasonable to believe that business partners could be selling drugs together" (especially in light of a similar relationship between Johnson and Jamison) and it was reasonable to conclude based on the "gir-" call and "streets" call that Foster was selling drugs "irrespective of his legitimate business ventures." *Id.* at 6-7. The Government asserts that "given this reasoned judgment, the Court should not draw any adverse inference about the investigators' mental state from the fact of the omission" even if the Court concluded the omission was "clearly critical" to probable cause. *Id.* at 7.

At the hearing, the affiant acknowledged that he had not commonly heard drug dealers use the term "ducking the rent" as a code relating to drug payment, could not remember a prior instance of hearing that phrase used in relation to drugs, and that "a person on the street" would think the reference was about rent. In responding to questions as to why he did not reference this exchange in the Wiretap Affidavit, the affiant said that the exchange was "arbitrary to us" and the agents didn't know what it meant. The affiant thought the exchange might be a joke about failing to pay for the drugs, but he wasn't sure. The affiant expressed his firm belief that the January 12 calls were to arrange payment for a drug transaction that had previously occurred. Although the affiant acknowledged he did not actually know for certain that a drug transaction had occurred prior to the calls on January 12, as no surveillance or explicit discussion confirmed it had, he nonetheless stated he believed such a transaction had in fact occurred following the "gir-" call, and that the January 12 calls were to arrange for Foster to pay Jamison for the drugs. The affiant said he did not believe "for one second" that the January 12 calls were about rent. He testified that he did not include the reference to rent in the Wiretap Affidavit because it did not change the way that he viewed the call.

46

With respect to the other information about Foster and Jamison's business relationship, the affiant confirmed he understood through listening to the calls that the men had some type of legitimate business relationship. At first the affiant testified that a business relationship between the two men would have *strengthened* the analysis of probable cause. Later, he stated he didn't think it was important to inform the Court about the nature of a relationship that didn't involve drug trafficking, and since he wasn't sure what Foster and Jamison were doing with the businesses he didn't include information about them.

The affiant's testimony revealed his approach was to omit from the Wiretap Affidavit information that did not change his belief that the January 12 calls were part of a drug transaction, even where plain and common language used during one of those calls pointed to another reasonable (and exculpatory) interpretation of the purpose of those calls. This method is not consistent with the purpose of requiring a judicial officer to authorize wiretaps. The affidavit supporting an application for a wiretap must provide an accurate account of the facts so that the Court can analyze if those facts provide probable cause to believe that an individual is engaged in criminal activity. When an affiant omits or excludes exculpatory details, the Court reviewing the affidavit is misled—and cannot perform its duty to analyze independently whether probable cause exists.

Of course, an affiant need not include every detail of potentially relevant information in a Title III affidavit. And an affiant need not include irrelevant information. But here, there was an obvious alternative explanation for the January 12 calls that should have been brought to the Court's attention. The affiant omitted any reference to rent (or "the rent man") in describing these calls and omitted any reference to Foster and Jamison's business relationship and shared interest in a property. Adopting an approach of including in an affidavit only

47

information consistent with one's own belief about an individual's culpability and excluding information pointing in the other direction exhibits "reckless disregard" for whether the Court will be misled.

In sum, the affiant's testimony suggested that he might have included the potentially exculpatory information in the Affidavit only if that information changed *his* belief that Foster was involved in a drug transaction. I do not conclude that his decision to omit information was a considered and reasonable judgment. *See Washington*, 29 F.4th at 108 (stating that police officer cannot "after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence") (internal quotation marks omitted). Instead, having considered the totality of the circumstances, including the testimony from the hearing and the objective evidence about the omitted calls, I find that the affiant omitted information from the Affidavit with reckless disregard as to whether doing so would mislead the Court. *See, e.g.*, *United States v. Kostin*, No. 1:24-CR-91-GHW, 2025 WL 1504409, at *20 (S.D.N.Y. May 27, 2025) ("Special Agent Lockridge consciously omitted select facts, which resulted in the presentation of an incomplete picture of the investigation's results to the magistrate"); *United States v. Frazier*, No. 3:19-CR-307 (SRU), 2020 WL 6263312, at *10 (D. Conn. Oct. 23, 2020) (finding that affiant acted with reckless disregard for the truth where it was "reasonable to infer that the . . . Affidavit omitted [certain] fact[s] to avoid complicating the investigative narrative that justified issuance of a search warrant"); *United States v. Davis*, No. 5:12-CR-71, 2014 WL 5305984, at *13 (D. Vt. Oct. 15, 2014) (finding that details concerning cooperating informant were omitted with reckless disregard because the information "[i]f disclosed, . . . would have caused a neutral and detached judge to discredit either all or part of the [cooperating informant]'s uncorroborated information"); *Lahey*, 967 F. Supp. 2d at 723

48

(finding affiant acted with reckless disregard where "each of the related omissions . . . drive in the same direction: establishing a connection between guard duty and the drug transaction, which connection the fuller evidence did not support").

### 4.    The Omitted Information Does Not Negate Probable Cause

Once a court determines that an affiant has omitted information from an affidavit with reckless disregard for whether the omissions would mislead, the court considers a hypothetical affidavit with the omitted information added back in. *See Ganek*, 874 F.3d at 82 ("To determine whether a false statement was necessary to a finding of probable cause, we consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information.") "If, after considering that hypothetical corrected affidavit, probable cause still exists to issue the warrant, then I should deny [defendant's] motion to suppress." *Frazier*, 2020 WL 6263312, at *2.

Foster supplies a version of a hypothetical affidavit and urges me to find that it does not support a probable cause. ECF No. 225, at 6-12. The Government argues that even if omitted information is considered, two of the calls included in the Wiretap Affidavit (the "gir-" call and the "streets" call) clearly provide probable cause for a wiretap, especially because these calls are supported by other allegations in the Wiretap Affidavit regarding Foster's previous criminal history, prior use of identical coded language, and information gained from a cooperating source. ECF No. 176, at 18-19; ECF No. 224, at 3. As I explain, I agree with the Government that probable cause nonetheless existed even after considering the omitted information. The core of Foster's argument is that, with this omitted information added, "the Government's evidence becomes insufficient to establish probable cause" because

"[n]one of the intercepted communications contains explicit discussion of drugs, established code words, discussion of quantities or prices, or operational details typical of drug transactions." ECF No. 164-1, at 11. Foster asks me to reject the Government's interpretation of the intercepts as unreasonable in light of the legitimate business relationship between Foster and Jamison and instead adopt his interpretation of the intercepts—that every communication between the two men can and should be read as relating to legitimate business ventures and a shared commercial property.

I do not go so far as to adopt the proposed corrected affidavit provided by Foster, which would explicitly include a declaration by the affiant that the corrected affidavit "does not establish probable cause." ECF No. 225, at 6-12. Adding the improperly omitted information back into a hypothetical affidavit would instead result in an affidavit that included a complete description of the exchange referencing "rent" in Session 223, and would note that this exchange occurred immediately before Foster said he had the money at his house. The hypothetical affidavit would describe Session 223 as a brief call that covered no other topics. Additionally, the corrected affidavit would indicate that intercepted calls showed that there was some form of business relationship between Foster and Jamison that involved a shared interest in a property and that the men spoke multiple times about topics relating to the property and businesses.

### a.    Session 119: The "Gir-" Call

The omitted language would not alter the description of Session 119 in the Wiretap Affidavit and has, at most, a marginal impact on the relevance of that call to the probable cause analysis. As described above, Session 119 is a discussion between Foster and Jamison on

January 10, 2025, which the Government characterized as a discussion about cocaine. The

Wiretap Affidavit includes part of the call:

> On January 10, 2025, at approximately 5:39 p.m., in session 119, JAMISON received an incoming telephone call on **Target Telephone 4** from [omitted phone number]. During a portion of the telephone call, FOSTER asked "You coming to Waterbury," to which JAMISON replied "Yeah". FOSTER then said "You got the gir - um, meet me at my house then when." to which JAMISON replied "Alright I'll call- I'll call you when I get in town, see where you at and I'll just pull up on you wherever." Based on training and experience, I believe when FOSTER asked "You got the gir," then stopped himself saying "girl" and changed the topic, he was referring to cocaine. "Girl" is a street term for cocaine. Whereas, heroin is referred to as "boy". I also believe the abrupt topic change occurred because, in 2020, FOSTER was intercepted during a T-III investigation. During the course of the 2020 investigation, FOSTER was intercepted and found to be involved in trafficking-controlled substances, likely causing him to exercise caution to avoid further implicating himself. It should be noted that Foster used the same code word, "girl" for cocaine, when he was intercepted during a T-III investigation in 2021.

Wiretap Aff. ¶ 78.

Although Foster argues that the Government's interpretation of the fragment "gir-" is

entirely speculative, he offers no alternative reading or inference that emerges by adding back

in any recklessly omitted material from other calls.[21] Even with the omitted material added

into the Wiretap Affidavit, the affiant still alleges that Foster had previously been involved in

narcotics trafficking and had, at that time, been heard on a wiretap using "girl" as a code word

for cocaine. *Id.* ¶ 78. The affiant identified Jamison as a person suspected of trafficking

narcotics who had been intercepted referring to cocaine. *Id.* ¶ 42. And the affiant reported that

---

[21] Foster simply asserts that the "meeting location is Mr. Foster's rental property—exactly where a landlord would visit for legitimate purposes." ECF No. 164-1, at 4. As noted above, it appears the meeting location was at Foster's home, not the shared property. But regardless, Foster does not explain why his use of an alleged coded reference to cocaine would be any less incriminating were the alleged drug transaction to have occurred at Foster's rental property rather than some other location.

a cooperating source had mentioned Johnson, Jamison, and Foster "acquir[ing] their controlled substances in a similar fashion"—although this information was provided in 2023. *Id.* ¶ 37. Foster does not plausibly allege that any of these statements were false or should be removed.

Adding the omitted material to the Affidavit reduces to some degree the incriminating nature of Session 119, but only marginally. The fact that agents had intercepted Foster and Jamison repeatedly discussing legitimate business and property maintenance issues does explain why Foster might be talking to Jamison, whom agents suspected of selling drugs, for reasons other than drug business. The omitted information also makes it less likely that the January 12 calls and apparent exchange of money were a culmination of a drug deal begun two days earlier during Session 119. But because Session 119 still contains what the Government reasonably asserts is a coded reference to cocaine, and especially in light of other relevant information in the Wiretap Affidavit, Session 119 continues to provide strong support for a probable cause finding.

### b. Sessions 223 and 224: The January 12 Calls

As discussed above, adding the omitted material weakens the inference that the January 12 calls related to a drug payment. The omitted material suggests that a discussion referencing "duck[ing] the rent man" in Session 223 might be a conversation literally about paying rent rather than paying for drugs.

### c. Session 914: The "Streets" Call

With respect to the "streets" comment in Session 914, Foster argues that, viewed in proper context—including the discussion that preceded the comment on the call—the comment was part of a "philosophical exchange" about Foster's legitimate businesses, his desire to leave his past life behind, his difficult neighborhood, and his "legitimate business

52

challenges in a difficult economic environment." ECF No. 163-1, at 4-5; ECF No. 164-1, at 12. The Government counters that, even adding in the omitted part of the call, Foster was clearly expressing a desire to leave his past behind—but that he was, in doing so, "admi[tting] that he was *currently* selling drugs." ECF No. 176, at 20 (emphasis in original); *see also* Wiretap Aff. ¶ 81 (describing "the use of the term 'streets,'" as suggesting active involvement in controlled substance trafficking); *id.* (stating that Foster and Jamison "both expressed a desire to exit the controlled substance business, yet their ongoing dialogue indicates continued involvement in the lifestyle").

> The Wiretap Affidavit includes the following regarding the "streets" call:
>
> On February 2, 2025, at approximately 11:36 a.m., during session 914, JAMISON placed an outgoing telephone call on Target Telephone 4 to FOSTER who was using Target Telephone 6. During a portion of the telephone call, FOSTER stated, "I don't want these streets no more. For real bro. I don't want…I used the motherfucker," to which JAMISON replied, "That's what I was trying to tell you when you first came home. This shit ain't worth it." JAMISON then said, "The reward ain't what it used to be. This shit ain't worth it." Based on training and experience, I believe when FOSTER said, "streets" [he] was referring to controlled substance trafficking. FOSTER's statement, "I don't want these streets no more," and JAMISON's response, "That's what I was trying to tell you when you first came home," reference FOSTER's release after a prior T-III investigation. JAMISON's comment, "The reward ain't what it used to be," indicates both are dissatisfied with the drug trade and want to leave it behind. However, the context of the conversation, including the use of the term "streets," suggests they are still actively involved in controlled substance trafficking at this time.

*Id.* ¶ 81. In a later section of the Wiretap Affidavit, the affiant mentioned this call again, writing:

> As noted above, JAMISON and FOSTER spoke at length about FOSTER's desire to make money away from "the streets" in session 914. This call with JAMISON leads investigators to believe that FOSTER has reclaimed the life he was leading before he was arrested on federal narcotics charges. In the conversation, FOSTER is seemingly having a moment of introspection and is affirming what JAMISON and JOHNSON talked about in earlier sessions.

> However, for the time being, FOSTER is still trafficking narcotics even with his vocal displeasure of how the drug trade is currently being operated.

*Id.* ¶ 110.

I do not conclude that the affiant's specific omission of the discussion that preceded the "streets" comment in Session 914 was an omission made with reckless disregard as to whether it would mislead the Court. However, I have concluded that the affiant acted with reckless disregard by failing to include anywhere in the Affidavit a reference to Foster and Jamison's business relationship, their shared interest in a property, and the fact that they discuss these topics frequently on the phone. Adding that information would have provided further context to the "streets" call, as it would have revealed that the men had topics to discuss other than the drug trade, including legitimate business challenges. However, even with the added information, the Government's interpretation of this call is not unreasonable and thus provides some support for a probable cause finding.

Although in my mind it presents a rather close question, I conclude that probable cause existed even after considering the omitted information. "Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Probable cause turns on whether there exists "a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Gates*, 462 U.S. at 243 n.13). As I have noted, the omitted information does little to undermine the Government's interpretation of the "gir-" call, which is the strongest evidence supporting probable cause. That call, combined with the evidence of Jamison's contemporaneous involvement in drug trafficking, Foster's recent history of drug trafficking, and Foster's

previous use of the word "girl" to refer to cocaine, provides support for a probable cause finding. Moreover, although Foster urges a benign interpretation of the "streets" reference, the Government's interpretation of the reference is not unreasonable even with the omitted information added to the affidavit.[22] Thus, even "putting aside erroneous information and material omissions," the Wiretap Affidavit still maintains a "residue of independent and lawful information sufficient to support probable cause." *Canfield*, 212 F.3d at 718. I therefore deny Foster's motion to suppress under *Franks*.

Finally, I conclude that the Wiretap Application, even corrected with the omitted information added, is sufficient to support a finding of necessity. Adding the omitted information would show only that Foster and Jamison had a business relationship and interest in a shared property; it would have no substantial impact on the analysis of why a wiretap was necessary to achieve the broader goals of the investigation.

### E.    Lucas' Search Warrant Challenge

Having found that the Wiretap Affidavit against Foster was based on probable cause, I need not address Lucas' arguments that the evidence against him should be suppressed or the indictment dismissed because the wiretap was unlawful. In the alternative, Lucas argues that I should suppress the evidence collected from his cell phone because the Master Affidavit submitted in support of the arrest and search warrant did not provide probable cause to seize and search Lucas' cell phone. ECF No. 165, at 8.

---

[22] Even adding the full content of the call leading up to the "streets" comment does not render unreasonable the inference the Government urges from that comment.

1.    **The Master Affidavit**

On April 2, 2025, the Court (the Honorable Maria E. Garcia, United States Magistrate Judge) authorized an arrest and search warrant for several individuals, including the Defendants in this case, as well as several locations, vehicles, and cell phones related to the Defendants. ECF No. 1.

The Master Affidavit, sworn to by Special Agent Alex MacNamara, describes a number of intercepts and surveillance operations involving Lucas, including several calls between Foster and Lucas, and several brief meetings in Foster's restaurant or a vehicle. Master Aff. ¶ 84, 102, 103-21.

The Master Affidavit reports that, during one call between Foster and Lucas on February 24, 2025, Foster stated: "Aye yo, um…What I seen you today with, right? And uh… You can't uh… I need like about [. . .] Probably about [Pause] 200." Master Aff. ¶ 111. Lucas responded in the affirmative, and when Foster asked "how long will [it] take you though," Lucas responded "Uh… Give me 'till tomorrow." *Id.* The affiant noted that "[b]ased on [his] training and experience," the "reference to '200' is indicative of 200 grams of a controlled substance, likely part of a kilogram quantity," and that Lucas was likely indicating that he was in the process of breaking it down. *Id.* ¶ 112. This was followed by a brief meeting the following day, during which surveillance recorded Foster and Lucas meeting briefly at Foster's restaurant. *Id.* ¶¶ 113-18.

The Master Affidavit also includes a call between Foster and Lucas on February 28, 2025, after which the two met at Foster's restaurant; both interactions were caught on intercepts and pole camera surveillance. *Id.* ¶ 127-31. Shortly after Lucas left, Foster placed an outgoing call to Lucas. The Master Affidavit describes the call as follows:

56

> During a portion of the telephone call, FOSTER said, "Hey yo, say what you said, Jay," prompting "Jay" in the background to respond, "It ain't that strong. It got maximum taste too, but it ain't strong." LUCAS replied, "Is a creeper," to which "Jay" asked, "Is a creep?" FOSTER then clarified, "He said it's a creep." Based on training and experience, investigators believe "Jay" was a tester, sampling a controlled substance mixture for potency. The exchange suggests LUCAS, as the mixer, was responsible for preparing the batch while FOSTER relayed feedback. LUCAS's statement, "It's a creeper," indicates he was explaining the high comes on slowly, which may be why "Jay" initially thought it was weak.

*Id.* ¶ 132. The affiant interpreted the in-person interactions as an exchange of narcotics between Foster and Lucas and the follow-up call as a conversation in which Foster and a "tester" give Lucas feedback about the taste and strength of those narcotics. *Id.* ¶ 133.

The Master Affidavit also included information about a parcel delivery to an address used by Lucas, which a postal investigator suspected contained controlled substances because "the parcel's weight . . . could be consistent with packages containing three thousand [counterfeit oxycodone] pills," and because the package was addressed to a "recipient [who] was believed to be deceased, the sender was a business not associated with the return address, and grammatical inconsistencies were observed in the return address." *Id.* ¶ 226.

### 2.    The Master Affidavit Supports Probable Cause

Lucas does not argue that the Master Affidavit includes falsehoods or omissions, and thus does not ask me to evaluate it under *Franks*. Instead, my task "is simply to ensure that the 'totality of the circumstances' afforded the [issuing] magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

Here, Lucas argues that the affiant's description of his calls with Foster, which the Master Affidavit categorizes as discussions about controlled substances based on the affiant's

"training and experience," are "mere speculation." ECF No. 165, at 10. He asserts that "training and experience" are an insufficient basis for the affiant to allege that the conversations in fact relate to controlled substances. *Id.* He further argues that without these calls, "none of the other allegations relating to Lucas in the Master Affidavit provide the necessary nexus to Lucas's cell phone" and thus do not support probable cause to seize and search that phone. *Id.* at 11. The Government responds that the "search of the phone was amply supported" by a finding of probable cause premised upon these calls and meetings between Lucas and Foster, which the affiant inferred were related to narcotics transactions. ECF No. 176, at 34.

I agree with the Government that there was a substantial basis for the determination of probable cause. Although Lucas argues otherwise, the Master Affidavit did not rely only on the "training and experience" of the affiant. ECF No. 165, at 10. To be sure, an "agent's opinion 'standing alone, might not be sufficient to establish a link' between a suspect's criminal activity and the place to be searched." *Id.* at 9 (quoting *United States v. Benevento*, 836 F.2d 60, 71 (2d Cir. 1987), *abrogated on other grounds by United States v. Indelicato*, 365 F.2d 1370 (2d Cir. 1989). But the Supreme Court has held that "due weight must be given . . . to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27; *see also* Wayne R. LaFave, 2 *Search & Seizure* § 3.2(c) (6th ed.) ("[M]ay the experience and expertise of the officer making the arrest or search be taken into account in determining whether probable cause is present? The answer is yes" but only where "its relevance in a particular case [is] sufficiently conveyed so that . . . it can be understood by the average reasonably prudent person.") (internal quotation marks and citation omitted).

58

The affiant's "training and experience" included several years of experience with the DEA and training on drug identification and drug trafficking investigations. Master Aff. ¶ 3. The affiant's inferences about Lucas' conduct were supported by intercepts and surveillance. To the extent that the affiant's interpretation of the information gathered by those methods was supported by his training and experience, the relevance of that training and experience was sufficiently explained. The affiant applied his training and experience to explain why the content and context of the February 24 call supported a finding of probable cause as to Lucas. For example, the affiant permissibly focused on the fact that Lucas was in direct contact throughout the early part of 2025 with Foster, who had previously been convicted of narcotics trafficking and was again under surveillance for suspected narcotics trafficking. Master Aff. ¶ 111. The affiant also analyzed Lucas's demeanor in the intercepted communications. The affiant notes that "the fragmented and hesitant manner in which FOSTER spoke indicates an awareness of potential wire intercepted communications and an effort to limit the clarity of their conversation." *Id.* ¶ 112. From these observations, the affiant posits that the "reference to '200' is indicative of 200 grams of a controlled substance, likely part of a kilogram quantity," and that Lucas was likely indicating that he was in the process of breaking it down. *Id.* ¶ 112.

Lucas disputes whether "200" is in fact coded narcotics language. But Lucas provides no alternative explanation for this call; he simply asserts that the Government's understanding of it was "mere speculation" without substantively addressing the Government's interpretation. ECF No. 165, at 10. Even if—standing alone—the February 24 call would not support a finding of probable cause, I find that these statements could be "reasonably interpreted to indicate what the [affiant] interpreted them to be," especially in light of the

59

ongoing investigation. *Fury*, 554 F.2d at 530-31; *Cancelmo*, 64 F.3d at 808 (narcotics code supportive of probable cause finding).

The affiant further supports his interpretation of this conversation by reporting that, on February 25, 2025—the day after the intercepted conversation—surveillance recorded Foster and Lucas meeting briefly at Foster's restaurant. *Id.* ¶¶ 113-18. The affiant explains his view that "LUCAS and FOSTER entering the restaurant together and leaving shortly after, without food or any indication of having ordered or eaten, suggests their purpose was not to dine. Their quick in-and-out movement indicates a brief exchange consistent with a narcotics transaction." *Id.* ¶ 121. This assertion, too, is summarily dismissed by Lucas as "mere speculation." ECF No. 165, at 10. But I see no reason why I should dismiss inferences, supported by wiretap intercepts, surveillance, and appropriate references to officer training and experience, as "mere speculation." Again, standing alone, this instance of surveillance would not suffice to justify the probable cause determination. However, it is relevant to consider in connection with other parts of the Master Affidavit.

Other calls in the Master Affidavit similarly support a finding of probable cause. Soon after Lucas visited Foster's restaurant on February 28, 2025, Foster placed an outgoing call to Lucas. The Master Affidavit states:

> During a portion of the telephone call, FOSTER said, "Hey yo, say what you said, Jay," prompting "Jay" in the background to respond, "It ain't that strong. It got maximum taste too, but it ain't strong." LUCAS replied, "Is a creeper," to which "Jay" asked, "Is a creep?" FOSTER then clarified, "He said it's a creep." Based on training and experience, investigators believe "Jay" was a tester, sampling a controlled substance mixture for potency. The exchange suggests LUCAS, as the mixer, was responsible for preparing the batch while FOSTER relayed feedback. LUCAS's statement, "It's a creeper," indicates he was explaining the high comes on slowly, which may be why "Jay" initially thought it was weak.

*Id.* ¶ 132. Lucas argues that the "*only* so-called evidence of this conversation being about a controlled substance is the agent's unfounded and unsupported interpretation of the call." ECF No. 165, at 11 (emphasis in original). But Lucas provides no reasonable alternative interpretation of the call.

Once again, the affiant's experience interpreting and understanding coded narcotics language is relevant to and supportive of the finding of probable cause. *See Fury*, 554 F.2d at 530-31; *Cancelmo*, 64 F.3d at 808. The affiant's training and experience as a DEA agent are clearly relevant to determining the meaning of "creeper" and the discussion of strength and taste. These determinations are also supported by the vagueness of the phone conversations, the repeated, often brief, in-person meetings at Foster's restaurant, and more generally by Lucas's association and frequent contact with Foster, who was suspected of narcotics trafficking. *See Oztemel*, 2024 WL 3090251, at *7 (comparing competing inferences presented by the parties and concluding that "the Government's reading of the [evidence] is at least as persuasive as Defendant's argument that it is exculpatory, particularly when read in conjunction with the other information presented in the . . . Affidavit").

It is true that the Master Affidavit does not describe controlled purchases from Lucas, recount surveillance showing Lucas engaged directly in drug sales, or report Lucas openly discussing drugs on the phone. But the pattern of behavior and contact between Foster and Lucas, especially the alleged coded language used on their phone calls and repeated brief meetings, are sufficient to support the probable cause finding and create a nexus to Lucas's phone. On the basis of this information, all of which was included in the Master Affidavit, I find that Judge Garcia had a substantial basis to find probable cause to issue a search and seizure warrant for Lucas's cell phone. Having ensured that the totality of the circumstances

afforded a substantial basis for making a probable cause determination, I "accord considerable deference to the probable cause determination of the issuing magistrate," *Clark*, 638 F.3d at 93, and therefore deny Lucas' motion to suppress evidence obtained from his cell phone.

## III.   CONCLUSION

For the foregoing reasons, Defendant Foster's Motion to Suppress Wiretap Evidence, ECF No. 164, and Defendant Lucas' Motion to Suppress the intercepted communications, dismiss the indictment, and suppress the evidence obtained from the search warrant, ECF No. 165, are hereby denied.

**SO ORDERED.**

New Haven, Connecticut
May 5, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge